**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jason Crews, | No. CV-23-01589-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Sun Solutions AZ LLC, et al., | |
| Defendants. | |

Pending before the Court is a motion for default judgment filed by Plaintiff Jason Crews ("Plaintiff"), who is proceeding *pro se*, against Defendants Sun Solutions AZ, LLC ("Sun Solutions") and Justin Villalobos ("Villalobos") (together, "Defendants"). (Doc. 34.) For the following reasons, the motion is granted in part and denied in part.

**RELEVANT BACKGROUND**

On August 7, 2023, Plaintiff initiated this action by filing the complaint. (Doc. 1.) The relevant factual allegations in the complaint are as follows. Between July 10, 2023 and July 28, 2023, representatives of Sun Solutions used an automatic telephone dialing system ("ATDS") to send "eight illegal telemarketing calls"[1] to Plaintiff's cell phone, which is not associated with a business and is registered on the Do-Not-Call registry. (*Id.*

---

[1] Although paragraph 16 of the complaint alleges that all of the challenged communications were phone calls, later paragraphs of the complaint indicate that some of the communications were text messages. This distinction is immaterial for liability purposes. *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 955 (9th Cir. 2009) ("The FCC has reasonably interpreted 'call' under the [Telephone Consumer Protection Act] to encompass both voice calls and text calls. This interpretation is reasonable and is therefore entitled to deference.").

¶¶ 2, 14-42.) Plaintiff had no prior business relationship with Sun Solutions and had not consented to the communications. (*Id.* ¶¶ 18, 20.)

More specifically, the complaint alleges that when Plaintiff received the first communication—a call from the phone number 323-529-0640—on July 10, 2023, he was "greeted by an individual who identified himself as Miguel." (*Id.* ¶¶ 16, 21.) When that call was "unexpectedly disconnected," Miguel immediately called back from the same number and sought to persuade Plaintiff to purchase "solar products and services." (*Id.* ¶¶ 23-27.)[2] Plaintiff "feigned interest in Miguel's products and services in order to determine the identity of the company responsible" for the call. (*Id.* ¶ 26.) However, Miguel declined to identify the name of his employer. (*Id.* ¶¶ 28-29.) Plaintiff told Miguel that he "couldn't talk" at that time but would "let him know if he was interested in their products and services" and disconnected the call. (*Id.*)

One week later, on July 17, 2023, Plaintiff received a call from a different phone number, 623-533-7343, at 5:17 p.m. (*Id.* ¶¶ 16, 30.) After Plaintiff did not answer that call, he received another call from the same number. (*Id.* ¶¶ 16, 31-32.) Plaintiff answered the second call and "was greeted by an individual who later identified himself as [Villalobos]." (*Id.* ¶ 33.) "Villalobos confirmed that Miguel worked for him and was calling on behalf of his company[,] [Sun Solutions]." (*Id.* ¶ 34.) Villalobos then "advertised his goods and services to Plaintiff" and "[d]uring the call, and without asking for Plaintiff[']s consent, . . . sent a text message to Plaintiff with his website [URL]." (*Id.* ¶¶ 35-36.) Plaintiff, in turn, "requested that Villalobos place Plaintiff on [Sun Solutions'] internal do-not-call list, and to send him a copy of [Sun Solutions'] internal do not call policies," and Villalobos said he would do so. (*Id.* ¶¶ 37-38.)

---

[2] Although the complaint alleges that Sun Solutions "does business as Vehicle Protection Network, and in the business [of] selling extended car warranties" (Doc. 1 ¶ 5), this allegation appears to be at odds with the remainder of the complaint. The Court notes that a complaint Plaintiff filed a month earlier against an apparently unrelated entity contains an identical allegation: "Defendant American Auto Repair Coverage, LLC ('AARC'), incorporated in Missouri, does business as Vehicle Protection Network, and in the business [of] selling extended car warranties." *Crews v. American Auto Repair Coverage LLC et al*, 2:23-cv-01588-DJH, Doc. 1 ¶ 5.

On July 28, 2023, Plaintiff received two unsolicited text messages from the phone number 323-740-6436. (*Id.* ¶¶ 16, 39-42.) The first "claimed to have just finished a remodel" and the second "advertised [Sun Solutions'] website." (*Id.* ¶¶ 40, 42.)

Although the complaint only provides narrative details regarding the seven communications summarized above—*i.e.*, the two calls from Miguel on July 10, 2023 using the telephone number 323-529-0640; the two calls from Villalobos on July 17, 2023 using the telephone number 623-533-7343; the text message from Villalobos on July 17, 2023, which Villalobos sent during the second call; and the two text messages from an unspecified sender on July 28, 2023 using the telephone number 323-740-6436—the complaint alleges there were eight challenged communications in total. (*Id.* ¶ 16.) The communication for which no narrative details are provided appears to be a call or text from the phone number 323-740-6436 on July 17, 2023. (*Id.*)[3]

Based on these allegations, the complaint asserts two claims for violations of the Telephone Consumer Protection Act ("TCPA"). (*Id.* ¶¶ 68-78.) In Count One, Plaintiff asserts a claim for violating the TCPA's prohibition against "sending calls, except for emergency purposes, to . . . a cellular telephone service using an ATDS." (*Id.* ¶ 69.) In Count Two, Plaintiff asserts a claim for "call[ing] Plaintiff's private residential number which was registered on the National Do-Not-Call Registry more than thirty-one (31) days prior to the calls, in violation of 47 U.S.C. § 227(c)(3)(F) and 47 C.F.R. § 64.1200(c)(2)." (*Id.* ¶ 75.) The complaint also alleges that Villalobos, the owner and manager of Sun Solutions, should be held individually liable because he "personally participated in the complained-of actions by personally directing and authorizing the scripting and selecting of calls to be made, selecting, and orchestrating the calling strategy, including by choosing to use pre-recorded calls." (*Id.* ¶¶ 6, 11.)

On January 5, 2024, the Court authorized Plaintiff to serve Sun Solutions by

---

[3] The table in paragraph 16 identifies four challenged communications that were sent on July 17, 2023, with one (from phone number 323-740-6426) occurring at 3:09 p.m. Although no facts were provided regarding this communication aside from the time and phone number, the Court notes that it was sent from the same phone number as the two text messages on July 28, 2023.

alternative means. (Doc. 17.)

On January 10, 2024, Plaintiff filed proof of service. (Doc. 20.)

On January 28, 2024, Plaintiff filed an application for entry of default against Sun Solutions. (Doc. 22.)

On February 5, 2024, the Clerk entered the default. (Doc. 24.)

On April 1, 2024, the Court authorized Plaintiff to serve Villalobos by alternative means. (Doc. 30.)

On April 4, 2024, Plaintiff filed proof of service. (Doc. 31.)

On April 25, 2024, Plaintiff filed an application for entry of default against Villalobos. (Doc. 32.)

On April 26, 2024, the Clerk entered the default. (Doc. 33.)

On April 28, 2024, Plaintiff filed the pending motion for default judgment. (Doc. 34.) Neither Defendant responded.

**DISCUSSION**

I. Default Judgment Standard

The "decision whether to enter a default judgment is a discretionary one." *Aldabe v. Alda be*, 616 F.2d 1089, 1092 (9th Cir. 1980). The following factors, known as the *Eitel* factors, may be considered when deciding whether default judgment is appropriate: (1) the possibility of prejudice to the plaintiff, (2) the merits of the claims, (3) the sufficiency of the complaint, (4) the amount of money at stake, (5) the possibility of factual disputes, (6) whether the default was due to excusable neglect, and (7) the policy favoring decisions on the merits. *Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986).

"[T]he general rule" for default judgment purposes "is that well-pled allegations in the complaint regarding liability are deemed true." *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 906 (9th Cir. 2002). "The district court is not required to make detailed findings of fact." *Id.* "However, necessary facts not contained in the pleadings, and claims which are legally insufficient, are not established by default." *Cripps v. Life Ins. Co. of N. Am.*, 980 F.2d 1261, 1267 (9th Cir. 1992).

II. The First, Fifth, Sixth, And Seventh *Eitel* Factors

"In cases like this one, in which Defendants have not participated in the litigation at all, the first, fifth, sixth, and seventh factors are easily addressed." *Zekelman Indus. Inc. v. Marker*, 2020 WL 1495210, *3 (D. Ariz. 2020.)

The first *Eitel* factor weighs in favor of default judgment. If the motion for default judgment were denied, Plaintiff would be without recourse for recovery. *PepsiCo, Inc. v. Cal. Sec. Cans*, 238 F. Supp. 2d 1172, 1177 (C.D. Cal. 2002).

The fifth and sixth factors weigh in favor of default judgment or are neutral. Due to Defendants' failure to participate, there is no dispute over material facts and no indication that default is due to excusable neglect.

The seventh factor generally weighs against default judgment, given that cases "should be decided upon their merits whenever reasonably possible." *Eitel*, 782 F.2d at 1472. However, the existence of Rule 55(b) of the Federal Rules of Civil Procedure, which authorizes default judgments, "indicates that this preference, standing alone, is not dispositive." *PepsiCo*, 238 F. Supp. 2d at 1177 (internal quotation marks omitted). "[T]he default mechanism is necessary to deal with wholly unresponsive parties who otherwise could cause the justice system to grind to a halt. Defendants who appear to be 'blowing off' the complaint should expect neither sympathy nor leniency from the court." 2 Gensler, Federal Rules of Civil Procedure, Rules and Commentary, Rule 55 (2023).

III. The Fourth *Eitel* Factor—The Amount Of Money At Stake

Under the fourth *Eitel* factor, the Court considers the amount of money at stake in relation to the seriousness of the defendant's conduct. Here, Plaintiff seeks $25,631.66, composed of $24,000 in statutory damages and $1,631.66 costs. (Doc. 34 at 3.) The Court has concluded in past cases that when a plaintiff seeks statutory damages and the Court retains discretion to reduce the requested award, the fourth *Eitel* factor weighs in favor of default judgment or is neutral. *See, e.g., Fornix Holdings LLC v. Pepin*, 2023 WL 4488976, *2 (D. Ariz. 2023); *G&G Closed Circuit Events LLC v. Ray*, 2022 WL 836810, *2-3 (D. Ariz. 2022); *Schmidt v. AmerAssist A/R Solutions Inc.*, 2020 WL 6135181, *2 (D. Ariz.

2020). Other courts have similarly concluded that the fourth *Eitel* factor supports default judgment in TCPA cases involving statutory-damage requests. *See, e.g., Aussieker v. TSHB, LLC*, 2024 WL 379394, *4 (E.D. Cal. 2024).

IV.   The Second And Third *Eitel* Factors—Merits And Sufficiency

That leaves the second and third *Eitel* factors—the merits of the claim and the sufficiency of the complaint. "These two factors are often analyzed together and require courts to consider whether a plaintiff has state[d] a claim on which [it] may recover." *Vietnam Reform Party v. Viet Tan-Vietnam Reform Party*, 416 F. Supp. 3d 948, 962 (N.D. Cal. 2019) (alterations in original) (internal quotation marks omitted). "Of all the *Eitel* factors, courts often consider the second and third factors to be the most important." *Id.*

A.   **Count One**

With respect to Count One, the second and third *Eitel* factors weigh against default judgment. As Plaintiff acknowledges, one of the elements of this claim is that the offending communications were sent using an ATDS. (Doc. 34 at 7, citing *L.A. Lakers, Inc. v. Fed. Ins. Co.*, 869 F.3d 795, 804 (9th Cir. 2017)).

Although the complaint asserts in conclusory fashion that Defendants used an ATDS, that assertion is not supported by the remaining factual allegations in the complaint. Notably, although the complaint acknowledges that "[a]udible pauses, clicks, and beeps are the hallmarks of ATDS systems" (Doc. 1 ¶ 47), the complaint does not allege that Plaintiff heard any pauses, clicks, or beeps when he answered the challenged calls. The complaint merely alleges that Plaintiff was "greeted by" Miguel and Villalobos upon answering their calls and also alleges that Miguel immediately called him back after the first call was inadvertently dropped. (*Id.* ¶¶ 22, 25, 33.) These details stand in contrast to the situations where courts have accepted the plausibility of ATDS-related allegations. *See, e.g., Schmidt*, 2020 WL 6135181 at *5 (concluding that "Schmidt has adequately alleged that AmerAssist utilized an ATDS to place those calls" in part because "Schmidt alleges that, upon answering AmerAssist's phone call, she was met with approximately three seconds of 'dead air,' after which she was connected with a live agent"); *McCarver*

*v. Cap. One, N.A.*, 2020 WL 2141804, *3 (C.D. Cal. 2020) ("Courts in this Circuit have held that experiencing 'dead air' on several calls may raise a reasonable inference that the caller is using an ATDS."); *Lofton v. Verizon Wireless (VAW) LLC*, 2015 WL 1254681, *5 (N.D. Cal. 2015) ("[G]eneral allegations [of use of an ATDS] are sufficiently bolstered by specific descriptions of the 'telltale' pause after plaintiff picked up each call until the agent began speaking, which suggests the use of a predictive dialing system, and thus renders plausible the conclusory allegation that an ATDS was used.").

Additionally, Plaintiff alleges that he received phone calls on only two dates, with the text messages sent during or less than two weeks after the last call. Courts have declined to credit conclusory ATDS-related allegations under similar circumstances. *See, e.g., Gross v. GG Homes, Inc.*, 2021 WL 4804464, *3 (S.D. Cal. 2021) (concluding that "[t]he targeted nature of the underlying texts contradicts the notion that Plaintiff's telephone number could have been produced through a random or sequential number generator . . . [and] renders implausible the allegation that Defendant sent the texts using an ATDS" and listing other cases where ATDS allegations were deemed implausible).

B.     **Count Two**

Count Two, unlike Count One, does not require the use of an ATDS. *Drew v. Lexington Consumer Advocacy*, 2016 WL 9185292, *4 (N.D. Cal. 2016) ("The TCPA broadly prohibits two types of phone calls: 1) unsolicited phone calls made using automatic dialers [pursuant to 47 U.S.C. § 227(b)]; and 2) phone calls made in violation of do-not-call registries [pursuant to § 227(c)].") (citations omitted).

To prevail on Count Two, Plaintiff must establish "three elements: (1) for each call, plaintiff received more than one other telephone call within any 12-month period; (2) the calls were made by or on behalf of the same entity; and (3) the calls were made in violation of the regulations prescribed under § 227(c)." *Aussieker*, 2024 WL 379394 at *3. The first two elements are satisfied for all eight communications at issue here—they were all placed in the same month and it is plausible to infer they were all made by or on behalf of Sun Solutions.

As for the third element, Plaintiff alleges that his telephone number "was registered on the National Do-Not-Call Registry more than [31] days prior to the calls," such that solicitations to that number were "in violation of . . . 47 C.F.R. § 64.1200(c)(2)." (Doc. 1 ¶ 75.) That regulatory provision "prohibits solicitations to any residential telephone subscriber who has registered his or her telephone number on the National Do-Not-Call Registry." *Aussieker*, 2024 WL 379394 at *3.[4]

The first two calls at issue (the calls from Miguel on July 10, 2023) qualify as telephone solicitations because Miguel expressly tried to sell goods and services to Plaintiff during the second call and it is plausible to infer that the first (dropped) call was intended to achieve the same purpose. *See* 47 U.S.C. § 227(a)(4) ("The term 'telephone solicitation' means the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted

---

[4] In his motion for default judgment, Plaintiff seems to suggest that 47 C.F.R. § 64.1200(c)(2) is not the only regulatory provision underlying Count Two and that liability may also be based, in the alternative, on violations of § 64.1200(d)(1) and/or § 64.1200(d)(6). (Doc. 34 at 9-10.) However, this is not the theory of liability alleged in the complaint. Count Two is premised only on § 64.1200(c)(2). (Doc. 1 ¶ 75.) *See generally Simmons v. Charter Comm's, Inc.*, 222 F. Supp. 3d 121, 137-38 (D. Conn. 2016) ("Unlike subsection (c), this subsection [(d)] has nothing to do with the national DNC registry. Rather, it is focused on the caller's procedures for maintaining its own DNC list."). At any rate, any claim arising under § 64.1200(d)(1) or (d)(6) would fail because the complaint does not allege facts that plausibly establish a violation of those provisions. Under § 64.1200(d)(1), "[p]ersons or entities making . . . calls for telemarketing purposes must have a written policy, available upon demand, for maintaining a do-not-call list." *Id.* Here, the complaint does not allege that Sun Solutions lacks such a policy, and any inference to that effect would be implausible in light of the fact that Plaintiff stopped receiving communications from Sun Solutions reasonably soon after he made his do-not-call request on July 17, 2023 (and well before the expiration of the 30-day grace period discussed elsewhere in this order). In a related vein, although the complaint alleges that Plaintiff requested a copy of Sun Solutions' internal do-not-call policy (Doc. 1 ¶¶ 37-38), it does not allege that Sun Solutions failed to comply with that request. And even assuming Sun Solution failed to comply, "Plaintiff cannot recover simply for [a defendant's] failure to send him the policy. Plaintiff must plausibly allege that [the defendant] did not have an internal do-not-call policy while making calls to Plaintiff." *Shelton v. Merchant Flow Fin. Corp.*, 2018 WL 6839562, *7 (D.N.J. 2018). Meanwhile, under § 64.1200(d)(6), "[a] person or entity making . . . any call for telemarketing purposes must maintain a record of a consumer's request not to receive further calls. A do-not-call request must be honored for 5 years from the time the request is made." *Id.* Here, the complaint does not allege that Sun Solutions failed to maintain a record of Plaintiff's do-not-call request, and any inference to that effect would be implausible in light of the fact that Plaintiff stopped receiving communications from Sun Solutions reasonably soon after that request (and well before the expiration of the 30-day grace period).

to any person, but such term does not include a call or message (A) to any person with that person's prior express invitation or permission, (B) to any person with whom the caller has an established business relationship, or (C) by a tax exempt nonprofit organization.").

The wrinkle as to the remaining calls is that, during his second call with Miguel, Plaintiff "feigned interest in Miguel's products and services" in an effort to learn the name of Miguel's employer and indicated that although Plaintiff "couldn't talk" at that time, he might still be interested in Miguel's products and services. (Doc. 1 ¶¶ 26, 29.) This exchange is significant because, as noted above, a phone call does not qualify as a "telephone solicitation" under the TCPA if "the caller has an established business relationship" with the recipient. 47 U.S.C. § 227(a)(4). An "established business relationship," in turn, is "formed by a voluntary two-way communication between a person or entity and a residential subscriber . . . on the basis of the subscriber's inquiry or application regarding products or services offered by the entity within the three months immediately preceding the date of the call, which relationship has not been previously terminated by either party." 47 C.F.R. § 64.1200(f)(5). *See also* 47 U.S.C. § 227(a)(2) (incorporating definition of "established business relationship" from 47 C.F.R. § 64.1200).

By feigning interest in the offered products and services and inquiring about the company that offered them, Plaintiff formed an "established business relationship" with Sun Solutions during his second call with Miguel. Thus, any calls placed or text messages sent during the existence of this "established business relationship" were not "solicitations" within the meaning of the TCPA.

An "established business relationship" can be "terminated by either party." 47 C.F.R. § 64.1200(f)(5). The regulations provide that a "seller-specific do-not-call request, as set forth in paragraph (d)(3) of this section, terminates an established business relationship for purposes of telemarketing and telephone solicitation even if the subscriber continues to do business with the seller." *Id.* § 64.1200(f)(5)(i). Paragraph (d)(3) exists in two versions—one that is effective now and one that is "delayed until announcement of effective date in the Federal Register." *Id.* § 64.1200(d)(3). The currently effective version

provides that entities "must honor" a seller-specific do-not-call request "within a reasonable time from the date such request is made" which "may not exceed 30 days from the date of such request." *Id.*

The complaint alleges that during his second call from Villalobos on July 17, 2023, Plaintiff "requested that Villalobos place Plaintiff on [Sun Solutions'] internal do-not-call list" and asked Villalobos "to send him a copy of their internal [do-not-call] policies." (Doc. 1 ¶ 37.)[5] The complaint further alleges that on July 28, 2023, *i.e.*, 11 days later, Sun Solutions sent Plaintiff two additional text messages. (*Id.* ¶ 16.) Because those messages were sent within a reasonable time (not to exceed 30 days) after Plaintiff made his do-not-call request, they are not actionable under the TCPA. *See, e.g., Barr v. Macys.com, LLC*, 2023 WL 6393480, *6 (S.D.N.Y. 2023) ("Neither has Plaintiff significantly alleged a violation of subsection (d)(3) for failure to honor Plaintiff's request to not be contacted. Plaintiff texted his request to not be contacted to Defendant on July 16, 2022. He alleges Defendant contacted him on July 19, 2022, three days and one business day after his request. But the mere fact that he received a call after his request is not a subsection (d)(3)

---

[5] The complaint appears to imply that Defendants should not have contacted Plaintiff after the second July 10, 2023 phone call because Plaintiff "told Miguel that [he] couldn't talk, and would let him know if he was interested in their products and services." (Doc. 1 ¶¶ 26, 29.) The complaint implies that the follow-up calls Plaintiff received from Villalobos on July 17, 2023 were inappropriate because Plaintiff had given Miguel a "clear indication that [Plaintiff] would call Defendants if he was interested." (*Id.* ¶ 30.) But "I'll call you" is only half of the old chestnut, "Don't call me; I'll call you." Having already feigned interest, Plaintiff's assertion that he would contact Sun Solutions if he was "interested" (presumably if he wanted to move forward with purchasing products and/or services) was not an affirmative request that Sun Solutions stop contacting him. Because Plaintiff did not ask Miguel to place him on Sun Solutions' internal do-not-call list or otherwise state that he wanted Sun Solutions to refrain from contacting him, it was permissible under the TCPA for Villalobos, in the hope of rekindling Plaintiff's (feigned) interest, to follow up. Plaintiff knew how to request that he be placed on the company's internal do-not-call list—he demonstrated this one week later, when he requested just that. Indeed, Plaintiff is a plaintiff in over two dozen cases filed in the District of Arizona between 2022 and 2024, most if not all of which assert similar TCPA claims. Plaintiff's statement that he would "let [Miguel] know" if he was interested was not the kind of conduct required to terminate an established business relationship. *Cf. Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1048 (9th Cir. 2017) ("Revocation of consent must be clearly made and express a desire not to be called or texted. That was not done here. No evidence in the record suggests that Van Patten told Defendants to cease contacting him on his cell phone. Some ways Van Patten could have communicated his revocation include, but are not limited to, plainly telling Defendants not to contact him on his cell phone . . . or messaging 'STOP' after receiving the first text message.").

- 10 -

violation. Under 47 C.F.R. § 64.1200(d)(3), a defendant must comply with a DNC request within 30 days.") (cleaned up); *Orsatti v. Quicken Loans, Inc.*, 2016 WL 7650574, *7 (C.D. Cal. 2016) (explaining that the current version of § 64.1200(d)(3) "allows the Defendant a reasonable [time] to honor the [do-not-call] request, not to exceed 30 days" and operates as a "safe harbor provision" barring liability unless subsequent communications are "outside of the 30 day window"); *Simmons v. Charter Comm's, Inc.*, 222 F. Supp. 3d 121, 140 (D. Conn. 2016) (no liability, even though plaintiff "received three additional calls" after making do-not-call request, because the defendant "honored Simmons' request within 30 days"); *Ott v. Mortg. Invs. Corp. of Ohio*, 65 F. Supp. 3d 1046, 1065-66 (D. Or. 2014) (discussing the "30-day grace period . . . to process internal do-not-call requests").[6]

For these reasons, the four communications on July 17, 2023 were not actionable "solicitations" under the TCPA because they were made while an "established business relationship" existed between Sun Solutions and Plaintiff. Meanwhile, the two text messages sent 11 days later were not actionable because they were sent during the 30-day grace period following Plaintiff's seller-specific do-not-call request. Thus, of the eight communications at issue here, only the first two (the phone calls placed by Miguel on July 10, 2023) are actionable.

Finally, those calls are actionable only as to Sun Solutions, not as to Villalobos. Because the allegations in the complaint establish that Villalobos had "direct, personal participation" in only three of the eight communications—all of which occurred on July 17, 2023, and thus are not actionable due to the then-existing "established business relationship" between Plaintiff and Sun Solutions—the allegations are insufficient to establish that Villalobos should be held personally liable. *Cf. Mora v. Zeta Interactive*

---

[6] Alternatively, even if liability might theoretically be available for a communication sent during the 30-day grace period, *see, e.g., Gill v. Align Tech., Inc.*, 2022 WL 1540016, *3-4 (E.D. Wisc. 2022) (denying motion to dismiss where defendant had an "internal protocol" of automatically placing phone calls to persons who asked to be placed on its do-not-call list, because "[t]his escalation in contact, seemingly in direct response to Plaintiff's requests to stop contact, plausibly indicates that [the defendant] violated the TCPA's regulations by failing to honor Plaintiff's do not-call requests within a reasonable amount of time"), the complaint is devoid of facts that plausibly suggest Sun Solutions fails to honor do-not-call requests in a reasonable amount of time.

*Corp.*, 2016 WL 3477222, *2 (E.D. Cal. 2016) ("Numerous district courts have held that corporate actors may be held individually liable for violating the TCPA where they had direct, personal participation in or personally authorized the conduct found to have violated the statute.") (cleaned up); *Ott*, 65 F. Supp. 3d at 1056-57 ("[C]orporate officers may be held individually liable under the TCPA if, as alleged here, they personally participated in or otherwise authorized the commission of wrongful acts, even if done on behalf of a corporation."). The allegation that Villalobos "personally participated . . . by personally directing and authorizing the scripting and selecting of calls to be made" and by "orchestrating the calling strategy, including by choosing to use pre-recorded calls" (Doc. 1 ¶ 11) is conclusory and unsupported by specific facts. This allegation also appears to be boilerplate, as there is no indication in the complaint that Sun Solutions used any "pre-recorded calls," nor does the complaint allege that Miguel seemed to be speaking from a script.

V. <u>Conclusion As To *Eitel* Factors</u>

Having weighed the *Eitel* factors, the Court concludes that Plaintiff is entitled to default judgment against Sun Solutions on Count Two for two of the eight communications and is otherwise not entitled to default judgment.

VI. <u>Damages</u>

Plaintiff calculates his request for $24,000 in statutory damages as follows: "16 violation[s] times $500 per violation, times treble damages." (Doc. 34 at 11.)

"The TCPA imposes a statutory penalty of $500 per violation and gives the court discretion to award up to three times that amount for knowing or willful violations. . . . To determine whether to impose enhanced statutory damages, courts look to the nature of defendants' conduct, defendants' prior TCPA violations and whether non-trebled damages would sufficiently deter future TCPA violations." *Aussieker*, 2024 WL 379394 at *5 (citations omitted).

As discussed above, there are only two actionable violations, so the statutory penalty is $1,000 (two violations times $500 per violation). Although Plaintiff contends that treble

damages should be awarded because "[t]he calls invaded Plaintiff's privacy and were frustrating, annoying, and obnoxious" and continued even after he asked them to stop (Doc. 35 at 10-11), Plaintiff "has not put forth evidence that [Defendants] has previously violated the TCPA or that non-trebled damages are insufficient to deter future TCPA violations." *Aussieker*, 2024 WL 379394 at *5. Indeed, the Court suspects an award of $1,000 against Sun Solutions—a business so small that its owner, who may or may not live with his parents (Doc. 27-1 at 3), personally makes sales calls—will have a significant deterrent effect.

Finally, Plaintiff is entitled to costs in the amount of the $402 filing fee. Plaintiff is also entitled to his service costs, because he prevailed against Sun Solutions and because Villalobos (despite being the prevailing party in relation to Plaintiff) failed, without good cause, to accept Plaintiff's offer to waive service of process.[7] *Alflex Corp. v. Underwriters Lab., Inc.*, 914 F.2d 175, 178 (9th Cir.1990) (per curiam) (holding that "service of process [is] a taxable item" for a prevailing party); *Estate of Darulis v. Garate*, 401 F.3d 1060, 1064 (9th Cir. 2005) ("Rule 4(d)(2) provides for an award of [service] costs regardless of which party can recover other costs pursuant to Rule 54(d)(1)."). However, Plaintiff has not substantiated his claim that his service costs totaled $1,229.66 (Doc. 34 at 11), nor has Plaintiff explained which portion of that sum applies to each defendant. Plaintiff may submit documentation substantiating his service expenses—and demonstrating which expenses were spent on which defendant—within 14 days of the date of this order.

Accordingly,

**IT IS ORDERED** that Plaintiff's motion for default judgment (Doc. 34) is **granted in part and denied in part**. The Clerk of Court is ordered to enter judgment in favor of Plaintiff and against Sun Solutions in the amount of $1,402, after which the Clerk of Court shall terminate this action.

---

[7] Plaintiff mailed a waiver-of-service request to Villalobos on August 11, 2023. (Doc. 13-1 at 1, 6.) It was sent to the same address at which the Court later authorized alternative service as to Villalobos. (Doc. 30.) The Court is thus satisfied that Villalobos "fail[ed], without good cause, to sign and return a waiver requested by a plaintiff," which triggered Plaintiff's entitlement to service costs under Rule 4(d)(2).

**IT IS FURTHER ORDERED** that Plaintiff may file documentation regarding his service expenses within 14 days of the date of this order. Plaintiff need not establish legal support for the expenses but must provide documentation establishing the separate service-related expenditures for each defendant. The Court retains jurisdiction for the limited purpose of imposing service-related expenses pursuant to Rule 4(d)(2).

Dated this 10th day of June, 2024.

Dominic W. Lanza
United States District Judge